**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY ROCCARO, MAXIMUM QUALITY FOODS, INC., | Civil Action No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| -against- | |
| ABDUL WAHAB NASARY, ABDUL TAWAB NASARY, | |
| Defendants. | |

<u>**COMPLAINT**</u>

Plaintiffs Gary Roccaro ("Mr. Roccaro") and Maximum Quality Foods, Inc. ("MQF," and together with Mr. Roccaro, "Plaintiffs"), by and through their undersigned counsel, allege as follows against Defendants Abdul Tawab Nasary ("Mr. Tawab Nasary") and Abdul Wahab Nasary ("Manager Nasary," and together, "Defendants" or "the Nasary Brothers"):

<u>**NATURE OF THE ACTION**</u>

1.      This action arises from Defendants' mismanagement of Tasty Poultry LLC d/b/a New York Poultry LLC ("Tasty Poultry" or the "Company") in violation of the New York Limited Liability Company Law and their common law duties to their co-member, Mr. Roccaro. In parallel, Defendants misappropriated MQF's confidential and proprietary business information and engaged in unlawful and/or unfair behavior in violation of the Defend Trade Secrets Act of 2016, damaging MQF.

2.      Mr. Roccaro has served as CEO of MQF, a leading independent food service distributor, for the past 25 years.  MQF sells approximately 30 million pounds of fresh poultry products every year.

3.      Over the course of his career, Mr. Roccaro has pursued numerous ventures focused on selling various food products to ethnic restaurants.  In 2004, he partnered with the Nasary Brothers to launch Tasty Poultry.

4.      By forming this limited liability company, the Nasary Brothers and Mr. Roccaro saw Tasty Poultry as an opportunity to expand poultry distribution, including fresh chicken, to the Afghan restaurant market. Mr. Roccaro and the Nasary Brothers were able to capitalize on both the Nasary Brothers' connections and relationships in the Afghan community and Mr. Roccaro's ties to MQF to their mutual benefit.

5.      For close to 20 years, Mr. Roccaro invested his personal financial capital and leveraged his professional relationships to support the growth of Tasty Poultry.  In addition, at Mr. Roccaro's behest, MQF generously provided Tasty Poultry most of its overhead expenses at no charge.  This included years of free office space and delivery services.  Most importantly, MQF sold products to Tasty Poultry at the exact same preferred pricing that it received from wholesalers, rather than marking those products up to benefit MQF.  These collective efforts enabled Tasty Poultry to drastically minimize its expenses for years while it grew into what is today a business with estimated annual sales of at least $40,000,000.

6.      Mr. Roccaro, Manager Nasary, and Mr. Tawab Nasary are essentially equal members of Tasty Poultry, with Manager Nasary and Mr. Tawab Nasary each owning 33.3% and Mr. Roccaro owning 33.4% of the Company.  All three members have also been employees of Tasty Poultry since its inception.

7.      Unexpectedly, in January 2024, with no notice, explanation or factual basis, Defendants terminated Mr. Roccaro's salary, notwithstanding that Mr. Roccaro for years received

no salary from Tasty Poultry so that the Company could prosper.  As the same time Defendants stopped paying Mr. Roccaro's salary, they also stopped paying him member distributions.

8.      What appeared at first blush to be a sudden freeze-out was, as Mr. Roccaro learned, another step in a concerted effort that had been underway for months to disengage Mr. Roccaro from Tasty Poultry, while continuing what had been a secret, months-long misappropriation of MQF's confidential and proprietary business information.

9.      Upon information and belief, in mid to late 2023, the Nasary Brothers formed a business alliance among (i) Tasty Poultry; (ii) American Food, Paper and Poultry LLC ("American Food"), a company which is owned by Manager Nasary's nephew, Wahedullah Abdali, and is a direct competitor of Tasty Poultry; and (iii) Mennella Poultry Co. ("Mennella Poultry"), a direct competitor of MQF (together, Tasty Poultry, American Food, and Mennella Poultry comprise the "Poultry Alliance").

10.      Mr. Roccaro discovered that the Poultry Alliance was using confidential and proprietary information that the Nasary Brothers had obtained through Tasty Poultry's relationship with MQF to the competitive advantage of the members of the Poultry Alliance and to the detriment of MQF.

11.      Following his unexpected termination, which functionally served as a complete ouster from a company of which he is a one-third owner, Mr. Roccaro sought to exercise his books and records inspection rights as a member of Tasty Poultry.  His goal was to investigate the management of the Company by the Nasary Brothers.  Not surprisingly, his efforts were thwarted, in an obvious attempt by the Nasary Brothers to conceal their mismanagement of Tasty Poultry and their unlawful and/or unfairly competitive behavior.

12.    Mr. Roccaro has for months attempted to resolve his disputes with the Nasary Brothers, but they have repeatedly refused to entertain any meaningful discussions and have instead continued to take actions that have caused, and continue to cause, harm to Mr. Roccaro and MQF.  Plaintiffs have been left with no option other than to initiate this action to hold the Nasary Brothers responsible for their improper and unlawful behavior.

## THE PARTIES

13.    Plaintiff Mr. Roccaro resides at 108 Conover Lane, Red Bank, New Jersey 07701.  He is a 33.4% co-member of Tasty Poultry, along with Mr. Tawab Nasary and Manager Nasary.

14.    Plaintiff Maximum Quality Foods, Inc., a food service distributor, is a New Jersey corporation.  It was incorporated on October 4, 1989.  It is located at 3351 Tremley Point Road, Linden, New Jersey 07036.

15.    Defendant Mr. Tawab Nasary resides at 211-21 34th Road, Bayside, New York 11361.  He is a 33.3% co-member of Tasty Poultry, along with Mr. Roccaro and Manager Nasary.

16.    Defendant Manager Nasary resides at 211-19 34th Road, Bayside, New York 11361.  He is the Manager of Tasty Poultry and a 33.3% co-member of Tasty Poultry, along with Mr. Roccaro and Mr. Tawab Nasary.  Mr. Tawab Nasary and Manager Nasary are brothers.

## JURISDICTION, VENUE, AND GOVERNING LAW

17.    This Court has subject matter jurisdiction over this action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' common law claims under 28 U.S.C. § 1367.  Further, this Court has

subject matter jurisdiction over this action under 28 U.S.C. § 1332 because neither Defendant is a citizen of the same state as either Plaintiff and the amount in controversy exceeds $75,000.

18.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  Defendants are subject to personal jurisdiction in New York, and Tasty Poultry is governed by the laws of the State of New York.

## FACTUAL ALLEGATIONS

### Tasty Poultry is Formed

19.    Tasty Poultry, a fresh poultry distributor, was formed as a New York Limited Liability Company on September 24, 2004.

20.    Upon formation, Tasty Poultry had two members: Mr. Roccaro and Mr. Tawab Nasary.  Mr. Roccaro contributed $10,000 in capital and Mr. Tawab Nasary contributed $20,000 in capital toward Tasty Poultry's operations.

21.    Mr. Roccaro and Mr. Tawab Nasary agreed that Mr. Roccaro owned 33.4% of Tasty Poultry and Mr. Tawab Nasary owned 66.6% of Tasty Poultry.  They further agreed that Mr. Tawab Nasary's 66.6% ownership percentage included a 33.3% ownership stake that Mr. Tawab Nasary was holding for his brother, Manager Nasary.

22.    Upon information and belief, an Operating Agreement was signed in 2004 when the Company was formed.

23.    Pursuant to the understanding of the members, Tasty Poultry was intended to be a limited distributor, buying and selling only 14 products (compared to a broadline distributor like MQF, which distributes upwards of 4,000 products).

24.     Upon information and belief, the Operating Agreement was amended in or around 2017 to add Manager Nasary as a member.  With that amendment, Mr. Tawab Nasary, Manager Nasary, and Mr. Roccaro became three equal co-members of Tasty Poultry, with Mr. Tawab Nasary and Manager Nasary each owning 33.3% of the Company and Mr. Roccaro owning 33.4% of the Company.  The amended Operating Agreement required unanimous consent among the three members.

25.     As the Manager of Tasty Poultry, Manager Nasary owed fiduciary duties to the members, including Mr. Roccaro.

26.     Mr. Roccaro did not at any time have any responsibility for the management of Tasty Poultry. Mr. Roccaro has been an employee of Tasty Poultry since its inception.  His employment responsibilities have included procurement of the products that Tasty Poultry sold. He has leveraged his experience and relationships in the industry to purchase these products at the lowest possible price for the Company.

27.     Mr. Tawab Nasary and Manager Nasary are also employees of Tasty Poultry. Mr. Tawab Nasary is responsible for invoicing, routing, and customer service.  Manager Nasary serves as the Company's bookkeeper.  Mr. Tawab Nasary and Manager Nasary work closely to oversee the day-to-day management and operation of Tasty Poultry.  Upon information and belief, Mr. Tawab Nasary endorses all the management decisions that his brother, Manager Nasary, makes for the Company.

28.     When Tasty Poultry was originally formed in 2004, Mr. Roccaro agreed to forego a salary and instead reinvest the monies owed to him in the Company.

**Mr. Roccaro and MQF Financially Support Tasty Poultry**

29.     In addition to his co-ownership of Tasty Poultry, Mr. Roccaro has been Chief Executive Officer and President of MQF for 25 years.  MQF has been in operation for nearly five decades and is roughly six times the size of Tasty Poultry.

30.     Mr. Roccaro, with assistance from his team at MQF, relied on his long-standing relationships and experience in the food services industry to procure products for Tasty Poultry in a cost efficient manner.  This afforded Tasty Poultry a myriad of benefits that would typically be unavailable to a food distributor of its size.

31.     First, Tasty Poultry paid the same discounted pricing (*i.e.*, with no markup) for the products it purchased from MQF that MQF paid to its suppliers.  These prices reflected significant discounts that suppliers provide in exchange for MQF's substantial volume of purchases—discounts that otherwise would not have been available to a limited distributor like Tasty Poultry.  In addition, Tasty Poultry was able to buy the exact amount of product it needed on a daily, as-needed basis from MQF's pre-paid inventory.  This arrangement eliminated Tasty Poultry's risk of over-purchasing or shrink, which are common inefficiencies that food distributors face.

32.     Second, MQF supported Tasty Poultry by providing it with many management services, all for no charge, including, but not limited to: office space at MQF's headquarters, utilities, property taxes, repairs and maintenance of warehouse equipment, and the use of MQF's office staff and services (*i.e.*, services such as postage, human capital resources, copy machines, telephone, garbage removal, computers, office supplies, and desks).

33.     Third, MQF provided numerous warehouse services to Tasty Poultry, including picking, packing, selecting, and loading products onto Tasty Poultry's trucks.

34.     Fourth, MQF provided Tasty Poultry with numerous *ad hoc* services, including, but not limited to, snow removal from trucks and parking lots during storms, parking lot repairs, supplying delivery drivers, as needed, and assisting with IRS filings.  For example, on July 1, 2024, MQF received an invoice for processing the Federal Employee Retention Tax Credit for Tasty Poultry.  MQF's team and vendors had assisted Tasty Poultry in filing for this refund, including by providing the vendor with the requisite tax and payroll information necessary to apply for the refund.

35.     MQF had no obligation or contract with Tasty Poultry to provide these services or accommodations to Tasty Poultry.  Rather, each of these benefits was generously provided to Tasty Poultry by Mr. Roccaro and MQF in an effort to assist and incubate the successful growth of the Company.

36.     In or around 2015, more than a decade after the Company was founded, MQF finally began to charge Tasty Poultry a nominal weekly service fee in the amount of $2,500.  This fee amounted to a minimal offset of all the services MQF provided the Company.

37.     In or around August of 2018, as Tasty Poultry's sales had steadily grown over the preceding three years, which increased the volume of cases that needed to be delivered each week, MQF increased the weekly service fee to $4,000.  Tasty Poultry then required special handling instructions, which further added to the costs MQF was incurring on behalf of the Company. As a result, in November 2018, the weekly service fee was increased to $7,256.79 and MQF also began charging Tasty Poultry $40 per delivery.

38.     At both the original and increased amounts, the weekly service fee charged by MQF was well under the fair market value of the services that MQF was providing Tasty Poultry (not to mention that MQF charged Tasty Poultry no weekly fee for the first decade plus of its

existence).  What is more, the $40 per delivery charge was grossly below the costs MQF incurred for fuel, mileage, delivery vehicle maintenance and upkeep, and salaries for delivery drivers and assistants.  Notably, MQF only charged Tasty Poultry this nominal delivery fee *after* providing free daily delivery services for approximately 14 years.

39.    Mr. Roccaro's industry knowledge and contacts repeatedly contributed to additional benefits for Tasty Poultry.  For example, in December 2023, Mr. Roccaro provided Defendants negotiated fixed prices for certain high volume fresh chicken products based on his proprietary market research and know-how regarding national chain pricing models, product demand for quick service restaurants, placements, egg sets, grain costs, and plant costs.  These prices are projected to save Tasty Poultry nearly $1,000,000 in 2024.

40.    In short, Tasty Poultry greatly benefitted from MQF's size, established reputation, large scale supplier relationships, preferred pricing, and well developed operations and infrastructure—all contributing to significant cost savings for Tasty Poultry.

41.    Despite Mr. Roccaro's outsized investment in Tasty Poultry's operations and development, the three members enjoyed essentially equal distributions of the Company's profits each year.

**Relocation of Tasty Poultry's Warehouse**

42.    As discussed above, from 2004 until late 2022, Tasty Poultry enjoyed first free and then substantially below-market fees for office, delivery, and other services provided by MQF.  In late 2022, the Nasary Brothers decided to relocate Tasty Poultry from MQF's warehouse and office space in New Jersey to a new location in the Bronx, New York.

43.    Defendants explained to Mr. Roccaro at the time that the move to the Bronx was intended to improve the commute for the Nasary Brothers and their family members who were

working for Tasty Poultry. In addition, Manager Nasary informed Mr. Roccaro that he hoped that the relocation would result in savings in toll fees, fuel costs, and overtime. In response, Mr. Roccaro cautioned the Nasary Brothers that the relocation would not be economically prudent and would have a detrimental economic impact on the Company in the long run.

44.    Nonetheless, facing pressure from the Nasary Brothers—especially as, upon information and belief, the Operating Agreement required unanimous member consent—Mr. Roccaro relented to their relocation request.

45.    The relocation resulted in a significant unnecessary expenses, all of which impacted the profit paid to the Company's three members. As part of the move, the Company had to make an investment of more than $1,000,000 in refrigeration, racking, and machine handling equipment for the new space, approximately $250,000 in other soft costs for the space (*i.e.*, computer systems), and an estimated $1,000,000 for inventory which Tasty Poultry would not have needed had they continued to buy on an as-needed basis from MQF. Tasty Poultry also had to hire an additional five to eight employees to work in the new warehouse because, given the lack of proximity of Tasty Poultry's new headquarters to MQF's, they could no longer rely on MQF's workforce.

46.    The Nasary Brothers' ill-conceived idea backfired in other respects as well. For example, the relocation decision caused Tasty Poultry to incur significantly higher costs in overhead, delivery, staffing, and product damages. As discussed above, all of these expenses had been provided for free or at a significantly reduced price when Tasty Poultry was housed in MQF's warehouse.

47.    This relocation also caused Tasty Poultry to incur a substantial new rent charge in 2023 that it otherwise would not have incurred.

48.     After and as a result of the relocation, the Company's net income dropped by 40% from 2022 to 2023.

## The Nasary Brothers Form the Poultry Alliance to Interfere with MQF's Business

### The Poultry Alliance is Formed

49.     Upon information and belief, the decision to relocate Tasty Poultry was the first step in the Nasary Brothers' illicit scheme to separate Mr. Roccaro from the Company, in favor of their family and cronies.

50.     In mid to late 2023, the Nasary Brothers agreed, on behalf of Tasty Poultry (and without Mr. Roccaro's knowledge or consent), that the Company would form the Poultry Alliance with two other distributors, Mennella Poultry and American Food.  Both of these entities are competitors with both MQF and Tasty Poultry, with Mennella Poultry directly competing with MQF and American Food directly competing with Tasty Poultry.  Additionally, American Food is owned by Manager Nasary's nephew.

51.     The objective of the Poultry Alliance was to misappropriate MQF's confidential and proprietary information for the commercial advantage of the members of the Poultry Alliance and to divert business opportunities in an effort to diminish MQF in and exclude MQF from the market.

52.     Since its inception, Tasty Poultry had the benefit of purchasing poultry products from MQF.  This meant that the Nasary Brothers knew the exact price that MQF paid its suppliers for its products.  As a distributor of MQF's products, Tasty Poultry received MQF's pricing information each week via email.  Tasty Poultry also regularly requested price checks, to which MQF obliged.  Further, when the Company moved to the Bronx, MQF began providing a physical copy of each of the invoices that MQF shipped to the Bronx location for Tasty Poultry.

As such, the Nasary Brothers had unfettered access to and knowledge of MQF's pricing arrangements with its suppliers and had a duty to keep that information secret.

53.     As distributors of poultry products that Tasty Poultry had purchased through MQF, the Nasary Brothers necessarily had access to MQF's confidential and proprietary information, including market research, know-how, and data regarding its customers, suppliers, and pricing.  Mr. Roccaro routinely reiterated the confidential nature of that information and, until approximately 2022, the Nasary Brothers appear to have upheld their duty to keep that information secret.  As the only limited distributor with which MQF had such a business relationship, Tasty Poultry, and therefore the Nasary Brothers, were uniquely positioned to gain access to MQF's confidential and proprietary information.

54.     The confidential and proprietary information that MQF provided to Defendants and the Company over the course of their years-long business relationship comprise MQF's trade secrets.

55.     The confidential and proprietary information and trade secrets enabled MQF to become, and maintain its position as, a leading independent food service distributor in the Northeast America region.  They also provide MQF actual and potential economic advantage from not being known, or readily ascertainable through proper means, by others, including MQF's competitor food service distributors, who might obtain economic advantage from the acquisition, disclosure, or use of this information and trade secrets.

56.     At all times, MQF fiercely guarded, and implemented reasonable measures to protect, its trade secrets and its other confidential and proprietary information from entering the public domain, or from otherwise being readily ascertainably by proper means by parties outside its business relationship with Tasty Poultry.

57.     MQF has developed a database containing its confidential and proprietary information, including, but not limited to, past, current, and prospective customer lists and pricing, supplier lists and pricing, proprietary market research, know-how, and other non-public information relating to MQF's pricing and business relationships with its suppliers and customers. MQF's efforts to protect this confidential and proprietary information include limiting access to the information.  All of MQF's employees sign a confidentiality agreement, and MQF's computer systems limit access to this information.  Mr. Roccaro regularly reminds those who have a duty to keep the information secret—such as the Nasary Brothers—of the importance of and requirement to keep the information confidential.

58.     Upon information and belief, the Nasary Brothers shared MQF's confidential and proprietary information with the other members of the Poultry Alliance.  This allowed Mennella Poultry to be able to sell products to Tasty Poultry at prices that were cheaper than MQF's pricing.  This unlawful disclosure also permitted American Food, a direct competitor of Tasty Poultry and a business owned by Manager Nasary's nephew, to share MQF's pricing in negotiations that American Food conducted.  Upon information and belief, this unlawful use extended to negotiations with both (i) larger distributors, from which American Food purchased its products, and (ii) customers (*e.g.*, restaurants), to whom American Food sold its products.

59.     The extent and scope of the arrangements between the Nasary Brothers and the other members of the Poultry Alliance was unknown to Mr. Roccaro at the time and the arrangements were formed without Mr. Roccaro's knowledge or consent.

<u>The Poultry Alliance Interferes with MQF's Relationships With Its Suppliers</u>

*Interference with Plymouth Beef Company*

60.     In or around October 2023, Manager Nasary admitted to Mr. Roccaro that he contacted the owner of Plymouth Beef Company ("Plymouth Beef"), one of MQF's longtime suppliers, to complain about MQF's pricing. According to Manager Nasary, during his phone call with Plymouth Beef, he shared the price at which MQF sells its hamburger products to its customers, in an attempt to negotiate a better price from Plymouth Beef for a direct purchase by Tasty Poultry in lieu of purchasing the products through MQF. When confronted about the illicit sharing of MQF's customer pricing data with one of its longtime suppliers, Manager Nasary admitted he inappropriately disclosed MQF's confidential and proprietary information.

*Interference with Pilgrim's Pride Corporation*

61.     The Poultry Alliance also interfered with MQF's distribution of its nine-piece fresh chicken product, which it distributes in the following locations: New York, New Jersey, Connecticut, Pennsylvania, Maryland, Rhode Island, Massachusetts, New Hampshire, Delaware, and Washington D.C. MQF exclusively purchased this product from supplier Pilgrim's Pride Corporation ("Pilgrim's"), and distributed it to its restaurant customers in these nine states and the District of Columbia.

62.     It is standard practice in the food services industry to engage in pricing negotiations pursuant to volume and projections based on historical year-over-year demands. Accordingly, every year Mr. Roccaro would negotiate a price for the nine-piece fresh chicken product with Pilgrim's based on projected purchases. Importantly, Mr. Roccaro would include in these negotiations the volume of product Tasty Poultry had historically purchased from MQF in order to achieve the best and lowest price of the product for the Company.

63.     As he had done for close to twenty years, in late 2023, Mr. Roccaro once again negotiated lower fixed prices with Pilgrim's for 2024.  And, consistent with prior practice, Mr. Roccaro included the volume of the nine-piece fresh chicken product Tasty Poultry was projected to purchase from MQF based on historical practice.  The Nasary Brothers flouted this long-standing custom and practice and provided no indication to Mr. Roccaro that they did not intend to continue their practice of purchasing this particular product from MQF in the upcoming year.

64.     Upon information and belief, in or around late 2023, the members of the Poultry Alliance  agreed that Mennella Poultry would engage in negotiations to purchase a nine-piece fresh chicken product from Mar-Jac Poultry Inc. ("Mar-Jac"), a poultry processor.  The Poultry Alliance further agreed that in these negotiations, Mennella Poultry would share with Mar-Jac the Nasary Brothers' knowledge of confidential and proprietary information relating to the nine-piece chicken product MQF purchased from Pilgrim's.  The Poultry Alliance simultaneously embarked on a campaign to disparage the Pilgrim's nine-piece fresh chicken product to customers in the market.  These agreements and actions allowed the Poultry Alliance to effectively drive down MQF's sales in the locations identified above.

65.     As a result of their clandestine negotiations, which relied on MQF's confidential and proprietary information, in or around late 2023, the Nasary Brothers purchased approximately 80,000 to 125,000 pounds per week of the Mar-Jac nine-piece fresh chicken product through Mennella Poultry, instead of the Pilgrim's product from MQF.  Although Mr. Roccaro was the Tasty Poultry employee responsible for procurement, the Nasary Brothers completed these purchases without his knowledge or consent. As a result, the Poultry Alliance gained control of the entire market share for this region, with collateral consequences to MQF and Pilgrim's.

66.     Because Tasty Poultry was now purchasing the Mar-Jac nine-piece fresh chicken product from Mennella Poultry, it decreased the volume of product that Tasty Poultry brought from MQF.  In turn, it lowered the volume that MQF needed to purchase from Pilgrim's. This caught both MQF and Pilgrim's by surprise. The Regional Director of Pilgrim's called Mr. Roccaro personally to inquire why MQF's actual purchases were smaller in volume than its historical year-over-year demands and their previously-agreed-upon purchase volume.  Pilgrim's further suggested that Pilgrim's might "cut off" all sales to MQF as a result of this deficit.

67.     Defendants' actions caused significant harm to MQF's business relationship with Pilgrim's as well as Mr. Roccaro's reputation and credibility in the market.  Defendants' actions also compelled Pilgrim's to consider stopping production of the nine-piece fresh chicken product.

68.     The Poultry Alliance further excluded MQF from selling the nine-piece fresh chicken product in the market it had once exclusively controlled by interfering with MQF's distribution of the product to customers (*e.g.*, restaurants).

69.     Upon information and belief, the Poultry Alliance agreed that American Food and Tasty Poultry would split the market for sales of the nine-piece fresh chicken product in the nine states mentioned above and the District of Columbia; *i.e.*, American Food would sell to one set of restaurant customers and Tasty Poultry would sell to a separate set of restaurant customers, splitting accounts in such a way that would exclude MQF from the market.  The Nasary Brothers entered into this agreement with the Poultry Alliance without Mr. Roccaro's knowledge or consent as a member or employee of the Company, in an attempt to unlawfully exclude MQF from the market in those ten locations.

70.     In addition, when Tasty Poultry and American Food approached restaurants in those locations, they had knowledge of MQF's confidential and proprietary information, including information regarding poultry pricing. Tasty Poultry and American Food then used that information to undercut MQF in the market.

### Mr. Roccaro Is Unexpectedly Frozen Out of the Company

71.     Upon information and belief, Mr. Tawab Nasary and Manager Nasary have each continuously received a salary from Tasty Poultry since its formation in 2004.

72.     Mr. Roccaro began receiving a salary from Tasty Poultry in or around 2010, having foregone a salary for the first six years of the Company's existence to allow Tasty Poultry to flourish.  Mr. Roccaro agreed to accept a nominal salary of approximately $500 per week, again electing to reinvest the balance of his salary in the Company.

73.     By 2021, Mr. Roccaro's annual salary had increased to $144,000, but still lagged behind the Nasary Brothers' annual salaries; that same year, the Nasary Brothers' salary was $156,000 each.

74.     In or around early 2021, Mr. Roccaro informed the Nasary Brothers that he wanted to be paid equally for his contributions to the Company as an employee.  As a result, Mr. Roccaro and the Nasary Brothers were each finally paid an equivalent salary of $156,000 in 2022.

75.     Abruptly and without notice, on January 5, 2024, the Nasary Brothers advised Mr. Roccaro that he would no longer receive a salary from Tasty Poultry, effective December 31, 2023.  When questioned, the Nasary Brothers stated that Company expenses had risen and Tasty Poultry could no longer afford Mr. Roccaro's salary.

76.     Their excuse was a pretext; the salary termination only applied to Mr. Roccaro.  There was no change to the Nasary Brothers' weekly salary, which remains at $3,000 per week, or $156,000 per annum, each.

77.     Even worse, at the same time the Nasary Brothers stopped paying Mr. Roccaro, they *increased* the salaries of other employees, including their sons and nephews:  Abdul Nasar Nasary, Abdul Rahim Nasary, Adrian J. Castellanos, Adrian D. Vido, Ahmad Nabi, Michael W. Montoya, and Nafi J. Nasary.

78.     The Nasary Brothers' decision to stop paying Mr. Roccaro a salary amounted to an effective termination of Mr. Roccaro's employment with Tasty Poultry.  Their decision to lie to Mr. Roccaro about the basis for his termination, while other employees' salaries remained consistent or increased, is a breach of duties to Mr. Roccaro.

79.     In addition, although Mr. Roccaro has paid taxes on his 2022 and 2023 distributions, the Nasary Brothers have not yet actually paid him any of the distributions owed for 2023 and only paid him a partial distribution for 2022.

80.     Furthermore, the Nasary Brothers have inexplicably refused to acknowledge the existence of a loan Mr. Roccaro made to the Company.  However, Tasty Poultry's Balance Sheets reflect that Mr. Roccaro loaned the Company $15,493.15, yet the Nasary Brothers refuse to repay this amount due to Mr. Roccaro

**The Nasary Brothers Frustrate Mr. Roccaro's Inspection Rights**

81.     In the immediate aftermath of his termination, Mr. Roccaro continued to work for Tasty Poultry, hoping that the situation would resolve amicably.  However, when Mr. Roccaro attempted to exercise his statutory right to inspect the Company's books and records, the Nasary Brothers repeatedly interfered with his efforts.

82.    Section 1102(a) of the New York Limited Liability Company Law ("NYLLCL") states that each New York limited liability company shall maintain the following records:

> (1) if the limited liability company is managed by a manager or managers, a current list of the full name set forth in alphabetical order and last known mailing address of each such manager; (2) a current list of the full name set forth in alphabetical order and last known mailing address of each member together with the contribution and the share of profits and losses of each member or information from which such share can be readily derived; (3) a copy of the articles of organization and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed; (4) a copy of the operating agreement, any amendments thereto and any amended and restated operating agreement; and (5) a copy of the limited liability company's federal, state and local income tax or information returns and reports, if any, for the three most recent fiscal years.

NYLLCL § 1102(a).

83.    Section § 1102(b) states: "(b) [a]ny member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, any financial statements maintained by the limited liability company for the three most recent fiscal years and other information regarding the affairs of the limited liability company as is just and reasonable."  NYLLCL § 1102(b).

84.    Following his forced termination, in January 2024, Mr. Roccaro requested to inspect the Company's books and records pursuant to NYLLCL § 1102 in an effort to investigate any financial and operational mismanagement of the business.  The Nasary Brothers did not respond to his request at first.

85.    On February 14, 2024, Mr. Roccaro made a second books and records request to Tasty Poultry, the Nasary Brothers, and Tasty Poultry's accountant, Michael Jennings.

86.    On March 15, 2024, Manager Nasary and Tasty Poultry produced only 20 documents in response to the February 14, 2024 letter (the "Initial Incomplete Production").  The Initial Incomplete Production omitted numerous key documents, including, but not limited to, the Original and Amended Operating Agreements, Tasty Poultry's current lease agreement, all 2024 financial records, distribution schedules, salary information, and vendor invoices.

87.    Based on the few documents that were produced, Mr. Roccaro began to more fully understand the extent of the Nasary Brothers' mismanagement of Tasty Poultry.  For example, in March 2024, the Nasary Brothers produced a non-descript, template operating agreement as part of the Initial Incomplete Production.  They misleadingly tried to represent this document as Tasty Poultry's Operating Agreement.  Months later, they asserted that Tasty Poultry has no operating agreement, effectively conceding their prior misrepresentation.

88.    In response to Mr. Roccaro's termination and upon learning of the ongoing mismanagement of the Company and misappropriation of trade secrets and confidential information, MQF discontinued its relationship with Tasty Poultry in or around May 2024.

**The Nasary Brothers' Financial and Operational Mismanagement of Tasty Poultry**

89.    As a member of the Company, Mr. Roccaro has the right to be informed of and have visibility into the operations and management of the Company.

90.    Manager Nasary has consistently failed to keep Mr. Roccaro informed of basic financial and operational information regarding Tasty Poultry.  Manager Nasary has, among other things, refused to provide Mr. Roccaro visibility into the operations or management of the

Company, and continues to do so to the present day.  These failures and refusals are violations of Manager Nasary's fiduciary duties to the Company and its members.

91.    For example, the Company suffered a 40% drop in net income from 2022 to 2023; yet the Nasary Brothers have not offered Mr. Roccaro a plausible explanation for the dramatic decline.

92.    On or around June 25, 2024, Manager Nasary surreptitiously withdrew nearly $800,000 from Tasty Poultry's business checking account.  This caused the account's balance to drop from $994,293.80 to $212,590.20.  A withdrawal of this magnitude is unusual and Mr. Roccaro was not provided any notification or explanation.

93.    On or around July 2, 2024, Mr. Roccaro learned he no longer had access to any of the Company's bank accounts, other than the business checking account.  Mr. Roccaro further observed that the Company's savings account had been closed.  Again, Mr. Roccaro was not notified or provided any explanation for these changes in the Company's finances.

94.    Despite his requests, Mr. Roccaro has no visibility into the current financial condition of the Company, including account balances, inventory, cost, or business strategy.  He has been denied requests for:  (i) monthly balance sheets; (ii) profit and loss data for January 2024 through the present; (iii) detailed month-end accounts payable for January 2024 through the present; (iv) detailed accounts receivable information, including the detailed aged receivables report; and (v) itemized inventory valuations for January 2024 through the present.

## CAUSES OF ACTION

### COUNT I
**Breach of Common Law and Statutory Fiduciary Duty Pursuant to NYLLCL § 409**
**(Mr. Roccaro Against Manager Nasary)**

95.    Mr. Roccaro incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

96.    NYLLCL § 409 imposes a statutory fiduciary duty on managers of limited liability companies to "perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with the degree of care that an ordinarily prudent person in a like position would use under similar circumstances."

97.    At all relevant times, Manager Nasary was the Manager of Tasty Poultry and accordingly owed Mr. Roccaro, a co-member and 33.4% owner of the Company, fiduciary duties.

98.    Among these fiduciary duties was the duty of care and good faith owed to member, Mr. Roccaro.  A breach of the common law fiduciary duty of care occurs when a fiduciary's decision amounts to gross negligence.  A breach of the common law fiduciary duty of good faith occurs where a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the Company.

99.    Manager Nasary has breached his fiduciary duties to Mr. Roccaro in order to enrich himself and his family members in a multitude of ways, including, by not limited to, as follows:

i.    <u>Failure to Pay Distributions</u>: It was at least grossly negligent for Manager Nasary to unexpectedly and without basis fail to pay Mr. Roccaro the distributions owed for 2022 and 2023, totaling at least $400,000.

ii.    <u>Salary Inequality</u>:  It was at least grossly negligent for Manager Nasary to unexpectedly and without basis stop paying Mr. Roccaro his salary effective December 31, 2023.  Since January 1, 2024, there has been a severe payment inequality among Mr. Roccaro and his co-members.  Moreover, Manager Nasary permitted the Nasary Brothers to retain their own salary levels and increased the salary of other family members who are

Tasty Poultry employees.  This conduct reflects Manager Nasary's decisions made for his and his family's personal gain, or made in bad faith.

iii.      <u>Mismanagement of Tasty Poultry</u>:  Manager Nasary has failed to properly manage the business and affairs of Tasty Poultry in numerous ways.  This includes, *inter alia*, (i) failing to maintain proper books and records of Tasty Poultry, including the Company's original and amended Operating Agreements; (ii) misrepresenting to Mr. Roccaro that a template operating agreement was the Company's Operating Agreement, and later conceding he lied; (iii) engaging in mismanagement that caused Tasty Poultry's net income to drop by 40%, from approximately $1.5 million in 2022 to approximately $900,000 in 2023; (iv) wasting company assets by relocating the Tasty Poultry warehouse from New Jersey to the Bronx in 2022 resulting in extreme financial harm to the Company; and (v) transferring nearly $800,000 in funds out of Tasty Poultry's business checking account in or around June 2024, without notice or explanation.

iv.      <u>Misappropriating MQF's Confidential and Proprietary Business Information</u>:  Manager Nasary worked with his brother, Mr. Tawab Nasary, to misappropriate MQF's confidential and proprietary information to benefit themselves and the other members of the Poultry Alliance.  The Poultry Alliance used this information to their competitive advantage in their business dealings with numerous distributors and customers in the same market in which MQF operates.

v.      <u>Failure to Disclose Material Financial, Operational and Lease Information</u>:  Manager Nasary has failed to disclose to Mr. Roccaro material financial, accounting, operational, and lease information.  Manager Nasary's refusal to turn over these key

documents in response to Mr. Roccaro's books and records requests flouts his obligations under NYLLCL § 1102.

100.    As a direct result of Manager Nasary's breach of fiduciary duties, Mr. Roccaro has suffered and will continue to suffer damages.

**COUNT II**
**Aiding and Abetting the Breach of Common Law**
**and Statutory Fiduciary Duty Pursuant to NYLLCL § 409**
**(Mr. Roccaro Against Mr. Tawab Nasary)**

101.    Mr. Roccaro incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

102.    As pled above, Manager Nasary owed common law and statutory fiduciary duties to Mr. Roccaro, which he breached in a multitude of ways.

103.    As a co-member of Tasty Poultry and the employee responsible for invoicing, Mr. Tawab Nasary worked hand-in-glove with his brother, Manager Nasary.  Mr. Tawab Nasary was intimately involved in the day-to-day management of the Company.  He was privy to all information held by his brother, Manager Nasary, and together the Nasary Brothers jointly made all business decisions.

104.    Mr. Tawab Nasary aided and abetted Manager Nasary in breaching his fiduciary duties to Mr. Roccaro in a multitude of ways, including, but not limited to, as follows:

i.    <u>Failure to Pay Distributions</u>: Manager Nasary has failed to pay Mr. Roccaro his distributions owed for 2022 and 2023, totaling at least $400,000.  Mr. Tawab Nasary was consulted and supported this decision.

ii.    <u>Salary Inequality</u>: Manager Nasary unexpectedly and without basis stopped paying Mr. Roccaro his salary from Tasty Poultry effective December 31, 2023.  Mr. Tawab Nasary was consulted and supported this decision. He and Manager Nasary jointly

informed Mr. Roccaro of their decision.  In addition, Mr. Tawab Nasary retained his own salary level, and increased the salaries of his other family members who are Tasty Poultry employees.  As a co-member of the Company and the employee responsible for invoicing, Mr. Tawab Nasary participated in and had full knowledge of this salary inequality.

iii.    <u>Mismanagement of Tasty Poultry</u>: Manager Nasary has failed to properly manage the business and affairs of Tasty Poultry, as alleged herein.  As a co-member of the Company and a senior level employee of the Company, Mr. Tawab Nasary participated in and had full knowledge of all management decisions. He attended meetings with Manager Nasary and supported him in the business.

iv.    <u>Misappropriating MQF's Confidential Business Information</u>: Mr. Tawab Nasary worked with his brother, Manager Nasary, to misappropriate MQF's confidential and proprietary information to benefit themselves and the other members of the Poultry Alliance, to the detriment of Mr. Roccaro and his company, MQF.

v.    <u>Failure to Disclose Material Financial, Operational, and Lease Information</u>: Manager Nasary has failed to disclose to Mr. Roccaro material financial, accounting, operational, and lease information.  As a co-member of the Company with a close family and business relationship with Manager Nasary, Mr. Tawab Nasary participated in and had full knowledge of Manager Nasary's failure to share this information, notify Mr. Roccaro regarding material account changes, and refusal to turn over key documents to Mr. Roccaro.

105.    Mr. Tawab Nasary participated in the alleged course of conduct, and knew of and aided and abetted the numerous breaches of fiduciary duties that were committed by Manager Nasary, as alleged herein.  Upon information and belief, Mr. Tawab Nasary participated

in the termination meeting related to Mr. Roccaro. He also worked closely together with Manager Nasary in the day-to-day management of the Company, including by sharing information and endorsing Manager Nasary's decisions.

106. Mr. Tawab Nasary knowingly and substantially assisted Manager Nasary in the alleged course of conduct and aided, encouraged, and/or ratified such conduct for his own benefit and the benefit of his family members, and to the detriment of Mr. Roccaro's membership interest in the Company, as alleged herein.

107. As a direct and proximate result of Mr. Tawab Nasary's actions, Mr. Roccaro has suffered and will continue to suffer damages.

### COUNT III
**Equitable Accounting**
**(Mr. Roccaro Against All Defendants)**

108. Mr. Roccaro incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

109. Mr. Roccaro and Defendants are equal members of Tasty Poultry. In the absence of an operating agreement, they are required to share profits and losses of Tasty Poultry equally.

110. Defendants owe fiduciary duties to Mr. Roccaro in his capacity as member of Tasty Poultry.

111. Mr. Roccaro entrusted money to Defendants in the form of capital commitments and contributions to Tasty Poultry.

112. Mr. Roccaro does not know, because Defendants have withheld from him information concerning, *inter alia*, (i) the full amount or type of distributions made to the Nasary Brothers to date; and (ii) the amount of costs, expenses or other amounts paid by Tasty Poultry to

any person or entity (including any attorney or accountant) out of distributions received by Tasty Poultry.

113.    Mr. Roccaro demands an accounting of Tasty Poultry because Defendants have withheld information about distributions received, as well as distributions and other amounts paid out, by Tasty Poultry.

114.    Defendants have purported to take various corporate actions and various expenditures that are unlawful, undisclosed, and inimical to Plaintiff.  These include the formation and participation in the Poultry Alliance, unfair and/or unlawful behavior using MQF's confidential and proprietary information, warehouse relocation, termination of Mr. Roccaro, unusually large cash withdrawals and account changes without any notice to Mr. Roccaro, and the refusal to grant Mr. Roccaro his full inspection rights.

115.    Mr. Roccaro has made demands to Defendants that they provide to him a full accounting of distributions paid by Tasty Poultry to any member and any other person or entity, including for distributions, legal, accounting, and other expenses.

116.    To date, Defendants have failed to provide a full and accurate accounting.

117.    A remedy at law is insufficient to ensure that Mr. Roccaro's rights are fully protected, as only a duly ordered accounting can compel Defendants to provide full and truthful information about distributions transmitted by Tasty Poultry to any of its members or other persons.

**<u>COUNT IV</u>**
**Misappropriation of Trade Secrets under the**
**Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, and New York Common Law**
**(MQF Against All Defendants)**

118.    MQF incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

119.    MQF's customer information, supplier information, know-how, pricing information, market research, and pattern of practice with suppliers and customers are trade secrets.  MQF owns this information.  The information is kept substantially secret and derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons (including suppliers and competitors) who can obtain economic value from their disclosure or use.

120.    MQF has taken reasonable measures to safeguard its trade secrets from unauthorized access, use, or disclosures, except to those who had a duty to maintain its secrecy.

121.    Through Mr. Roccaro's co-membership in Tasty Poultry, MQF shared the trade secrets with Defendants with the intention that Tasty Poultry and MQF should mutually benefit from such limited confidential disclosure, as described herein.  MQF shared the trade secrets with Tasty Poultry with the expectation and understanding that they would be kept secret by Tasty Poultry and Defendants.  Defendants agreed to keep secret and further agreed to maintain the secrecy of the trade secrets.  Defendants had a duty to maintain the secrecy of the trade secrets.

122.    Defendants had a duty to protect MQF's trade secrets, including, but not limited to, confidential and proprietary information regarding MQF's customers, suppliers, pricing, and market research, because they were entrusted with it for the limited purpose of purchasing poultry products from MQF.

123.    Defendants stole MQF's trade secrets using improper means and disclosed them to the Poultry Alliance without MQF's consent and against MQF's will.

124.    Defendants knew and should have known that MQF did not consent to the disclosure of its trade secrets.

125.    Defendants' misappropriation of MQF's trade secrets for the competitive advantage of themselves and other members of the Poultry Alliance was a breach of the duty to protect those trade secrets.

126.    Defendants used and disclosed MQF's trade secrets with full knowledge that the trade secrets were acquired contrary to their duties to maintain the secrecy of the trade secrets.  Upon information and belief, Defendants used MQF's trade secrets to undercut MQF in the market by driving down the cost of goods sold to customers.  Defendants further used MQF's trade secrets in an attempt to exclude MQF from the market.  Upon information and belief, Defendants also used MQF's trade secrets to drive down the costs of the goods it purchased from suppliers, further allowing it to undercut and exclude MQF from the market.

127.    The Poultry Alliance acquired and used MQF's trade secrets from Defendants while knowing that the trade secrets were acquired by improper means.

128.    Defendants' conduct constitutes knowing, willful, and malicious misappropriation.

129.    As a direct and proximate result of Defendants' actions, MQF has suffered and will continue to suffer damages.

### COUNT V
### Tortious Interference with Business Relationship
### (MQF Against All Defendants)

130.    MQF incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

131.    MQF serves as the primary distributor of various chicken products to restaurants in the following states: New York, New Jersey, Connecticut, Pennsylvania, Maryland, Rhode Island, Massachusetts, New Hampshire, Delaware, and Washington D.C.  It has fostered

and developed its relationship with these restaurants and other customers in these states by being their supplier for many years.

132.    Defendants were aware of MQF's relationship with these restaurants and knew that MQF had an advantage in the marketplace as a result of its relationships. Upon information and belief, Defendants sought to undercut MQF in the market by intentionally interfering with MQF's relationships with these restaurants, including by denigrating MQF's products.

133.    Upon information and belief, Defendants, along with the other members of the Poultry Alliance, used the confidential and proprietary information Defendants stole from MQF, including, but not limited to, information regarding pricing, customer lists, and know-how, to interfere with MQF's relationships with the restaurants. This interference was also a breach of the fiduciary duties that were owed to Mr. Roccaro.

134.    Defendants' intentional interference with MQF's relationship with the restaurants has caused injury to MQF including by damaging its reputation and credibility in the market. MQF has also been injured by Defendants' tortious interference by losing sales and business opportunities with the restaurants.

135.    As a direct and proximate result of Defendants' actions, MQF has suffered and will continue to suffer damages in an amount to be determined at trial.

<u>**COUNT VI**</u>
**Tortious Interference with Business Relationship**
**(MQF Against All Defendants)**

136.    MQF incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

137.    MQF has fostered and developed a relationship with suppliers, including Pilgrim's. This relationship has been beneficial for MQF as it has allowed MQF to purchase

products in large volumes and at favorable prices. MQF's relationship with Pilgrim's was also beneficial to Tasty Poultry, as MQF's savings were passed on to Tasty Poultry when purchasing products from MQF. Tasty Poultry thus enjoyed pricing that was well below what would typically be available to a distributor of its size.

138.    Upon information and belief, Defendants knew of the relationship MQF had developed over the years with Pilgrim's as shown at least by the savings that were passed on to Tasty Poultry.

139.    Upon information and belief, Defendants intentionally interfered with MQF's relationship with Pilgrim's by using the confidential and proprietary information they stole from MQF and conspiring with the Poultry Alliance to purchase products from Mar-Jac instead of from MQF. This interference was also a breach of the fiduciary duties that were owed to Mr. Roccaro. Upon information and belief, Defendants interfered with MQF's relationship with Pilgrim's despite Defendants' knowing that MQF had negotiated the best prices with the reasonable expectation that Tasty Poultry would be purchasing its products from MQF.

140.    Defendants' intentional interference has caused injury to MQF's relationship and reputation with Pilgrim's, because, for the first time in its decades-long relationship with Pilgrim's, MQF was unable to fulfill its projected purchase volume commitments for the nine-piece fresh chicken product and was threatened to be "cut off" by Pilgrim's as a result of this deficit.

141.    As a direct and proximate result of Defendants' actions, MQF has suffered and will continue to suffer damages in an amount to be determined at trial.

<u>COUNT VII</u>
**Unfair Competition**
**(MQF Against All Defendants)**

142.    MQF incorporates and re-alleges each of the preceding paragraphs of the Complaint as if fully set forth herein.

143.    Over the past 25 years, MQF and Mr. Roccaro have invested substantial labor, skills, and expenditures to cultivate MQF's business relationships and to build its credibility and reputation in the food industry.

144.    As a result of such efforts, MQF possess several proprietary advantages, including, but not limited to, its business information and strategies, business opportunities, relationships with suppliers, competitive pricing, customer lists, and other valuable trade secrets with respect to its operations in connection with the distribution of food products.  Plaintiffs have taken steps to maintain the secrecy of MQF's trade secrets and other confidential proprietary business information.

145.    MQF's trade secrets and confidential and proprietary information are valuable to Defendants.  In fact, Tasty Poultry's success in the sale of fresh poultry has been dependent on the labor, skills, and expenditures of MQF and Mr. Roccaro since its formation.

146.    By the nature of its business relationship with MQF, Defendants had access to MQF's confidential and proprietary information.  Defendants understood that they had a duty to keep this information secret.

147.    Defendants knowingly misappropriated confidential and proprietary information that was the result of Plaintiffs' labor, skill, and expenditures, and did so in bad faith. Defendants have performed the following acts to pirate away MQF's business for Defendants' benefit: sharing MQF's confidential pricing information with the Poultry Alliance, whose members are direct competitors of MQF; leveraging MQF's pricing in negotiations with suppliers

in attempt to broker lower prices; using MQF's pricing and supplier information to purchase directly from MQF's suppliers rather than purchasing the products through MQF; diverting MQF's sale of chicken products to restaurants in New York, New Jersey, Connecticut, Pennsylvania, Maryland, Rhode Island, Massachusetts, New Hampshire, Delaware, and Washington D.C., to itself; and engaging in other acts alleged herein.

148.    Defendants have also misappropriated business opportunities for the benefit of the Poultry Alliance.  Upon information and belief, Defendants and the Poultry Alliance conspired to split the market for sales of chicken products in the nine states mentioned above and the District of Columbia in a way that would exclude MQF from that market, seeking to entirely block MQF out of the market.  Defendants did not have the consent of Mr. Roccaro as member or employee of Tasty Poultry to cut out MQF in this manner.  Upon information and belief, Defendants and the Poultry Alliance leveraged the confidential and proprietary information that they stole from MQF, including, but not limited to, supplier information, customer lists, and know-how, to divert these business opportunities to the Poultry Alliance.  In other words, Defendants and the Poultry Alliance impermissibly misappropriated the skill and labors of MQF in excluding it from the market.

149.    Defendants gained an unfair advantage when they exploited MQF's trade secrets and other confidential and proprietary information, which are the result of Plaintiffs' labor, skill, and expenditures.  These acts constitute unlawful and/or unfair competition prohibited under New York common law.  Defendants' actions described herein have at all times relevant to this action been willful and/or knowing.

150.    As a direct and proximate result of Defendants' actions, MQF has suffered and will continue to suffer damages in an amount to be determined at trial, including by suffering reduced sales.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request a judgment of this Court in their favor against Defendants, for damages and relief on Plaintiffs' causes of action, and such other relief as follows:

A.    Issuing an order (i) declaring that Mr. Roccaro is entitled full and unimpeded access to inspect and copy Tasty Poultry's books and records as per NYLLCL § 1102 and (ii) directing Defendants to provide Mr. Roccaro with an accounting of the affairs of Tasty Poultry;

B.    Issuing an order compelling Defendants to repay Mr. Roccaro the $15,493.15 he loaned to the Company;

C.    Issuing an injunction prohibiting Defendants from using MQF's trade secrets and other confidential and proprietary information for their own and the Poultry Alliance's benefits, and to the detriment of Plaintiffs;

D.    Issuing an injunction prohibiting Defendants from using, disseminating, or retaining any of MQF's trade secrets;

E.    Awarding Plaintiffs punitive and compensatory damages and damages for Defendants' unjust enrichment in amounts to be determined at trial;

F.    Awarding Plaintiffs exemplary damages under 18 U.S.C. § 1836(b)(3)(C) of two times the amount of damages awarded to Plaintiffs under 18 U.S.C. § 1836(b)(3)(B);

G.    Awarding Plaintiffs pre- and post-judgment interest;

H.     Awarding Plaintiffs the costs, expenses, and fees that they have incurred and continue to incur to enforce their statutory and common law rights, including attorney's fees (including under 18 U.S.C. § 1836(b)(3)(D)), experts' fees, and other costs and expenses incurred in connection with this action; and

I.     Awarding Plaintiffs such other and further relief, in law and equity, as this Court deems just and proper.

Dated: New York, New York
        August 1, 2024

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT, LLP

By: */s/ Jared Stanisci*
    Jared Stanisci
    Nicholas A. Gravante, Jr.
    Danielle Tully
    Gillian Groarke Burns
    Jayshree Balakrishnan
    200 Liberty Street
    New York, New York 10281
    Tel.: (212) 504-6000
    Fax: (212) 504-6666
    jared.stanisci@cwt.com
    nicholas.gravante@cwt.com
    danielle.tully@cwt.com
    gillian.burns@cwt.com
    jayshree.balakrishnan@cwt.com

*Attorneys for Plaintiffs*